**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 17-CR- 46 (RBW)** |
| | : | |
| **KASSIM TAJIDEEN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR PRETRIAL RELEASE**

The United States, by and through the undersigned attorneys, respectfully opposes the Defendant's Motion for Pretrial Release.

The defendant stands charged with, *inter alia*, violations of United States sanctions laws because of his illegal business dealings with U.S. entities since his 2009 designation by the U.S. Department of Treasury as a Specially Designated Global Terrorist. These charges expose the defendant to criminal penalties of up to 20 years of incarceration, and preliminary analysis indicates an estimated Sentencing Guidelines Range of well over 10 years of incarceration should the defendant go to trial and be convicted on all charges. The defendant is an extremely wealthy businessman with vast overseas holdings, a foreign criminal record, multiple known foreign citizenships, no ties to the community or to the United States (aside from his illegal business dealings), and a history of using fake documents. The combination of a possibility of a lengthy sentence, the defendant's excessive wealth, lack of any ties to the United States (other than his illegal business dealings), his foreign citizenship of at least one country with which the United States has no extradition treaty, his prior foreign felony conviction related to forgery of documents, and other factors to be described below, are strong evidence to believe that the defendant is a risk of flight. Accordingly, there are no conditions or combination of

conditions that can reasonably assure his presence for trial in this matter. Further, the defendant's current conditions of detention are appropriate and not punitive.

**RELEVANT PROCEDURAL HISTORY**

On March 7, 2017, after a Drug Enforcement Administration ("DEA") investigation spanning a period of years, a grand jury in the District of Columbia issued an indictment charging the defendant with violations of the International Emergency Economic Powers Act ("IEEPA"), the Global Terrorism Sanctions Regulations ("GTSR"), as well as conspiracy and money laundering statutes. Foreign authorities apprehended the defendant overseas on approximately March 12, 2017 and DEA agents transported him to the United States on March 24, 2017. The defendant was presented in the District of Columbia on March 24, 2017, and was held without bond at the request of the government. A detention hearing was set to occur on March 29, but the defendant filed a notice conceding detention and waiving any written factual findings, so no hearing was held. The defendant remains held without bond.

**FACTUAL BACKGROUND**

On May 27, 2009, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated the defendant as a Specially Designated Global Terrorist ("SDGT"). According to the OFAC designation, the defendant is an important financial contributor to the terrorist organization Hizballah who operates a network of businesses in Lebanon and Africa, and who has contributed tens of millions of dollars to Hizballah. This designation was made pursuant to Executive Order 13224 to disrupt the operations, fundraising, and support networks of Hizballah by designating individuals providing support to terrorists or acts of terrorism. The designation by prohibits, *inter alia*, U.S. persons from knowingly participating in transactions with, or for the benefit of the defendant without receiving a license from OFAC.

After this designation, the defendant, through counsel, filed petitions and other documents with OFAC claiming both that his designation was improper and that his business network was taking significant measures to insure that he was in compliance with OFAC regulations. Instead of heeding the designation, at the same time, the defendant continued to conduct business with U.S. entities through a large network of businesses with ever-changing names run by a relatively small group of personnel, effectively hiding his own involvement in the transactions. Email traffic, recorded phone calls, witness interviews, and statements made by the defendant and by his counsel to OFAC prove that the defendant knew of the designation and its impact, and took affirmative steps to circumvent the restrictions on his business dealings with U.S. entities. The indictment alleges Tajideen engaged in illegal transactions totaling approximately $26 million with three U.S. companies; uncharged illegal transactions would bring the total to more than half a billion U.S. dollars, transacted by dozens of companies acting on behalf of the defendant, or for his benefit.

## PROCEDURES AND STATUTORY STANDARD

The "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). The parties may proceed by way of proffer and hearsay is permitted. Id.; United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996). The indictment, standing alone, constitutes probable cause that the person charged committed the offense. Id. Moreover, the Government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986); United States v. Williams, 798 F.Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device, since the detention hearing is not to be turned into a mini-trial and is not to be

used as a subterfuge to obtain discovery. Smith, 79 F.3d at 1210, see also Williams, 798 F. Supp. at 36.

The Bail Reform Act Title 18 U.S.C. Section 3142(e), which authorizes detention without bail pending trial, provides that "[i]f, after a hearing pursuant to the provisions of subsection (f) of [that] section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."

A finding that no condition or combination of conditions will reasonably assure the appearance of the defendant must be supported by a preponderance of the evidence, and a finding that no condition or combination of conditions will reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence. See 18 U.S.C. § 3142(e); United States v. Simpkins, 826 F.2d 94, 96 (D.C.Cir.1987) ("While the [Bail Reform] Act requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community ... it is silent as to the level of proof required to establish risk of flight. This circuit, however, has ruled that such a finding need only be supported by a 'preponderance of the evidence.' ") (quoting United States v. Vortis, 785 F.2d 327, 329 (D.C.Cir.1986)); see also United States v. Xulam, 84 F.3d 441, 442 (D.C.Cir.1996) (per curiam).

Factors that the Court should consider when determining whether there are release conditions that will reasonably assure a defendant's appearance as required and the safety of any person and the community are: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to

drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e). In this case, an analysis of the factors listed above strongly favors the defendant's detention.

## ANALYSIS

### I. NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

The nature and circumstances of the offenses charged are serious. OFAC designations pursuant to the Global Terrorism Sanctions Regulations seek to block property and transactions between United States persons and persons who commit, threaten to commit or support terrorism, with the obvious goal of reducing the resources available to terrorist organizations. Here, the defendant, who himself has been designated by OFAC for providing tens of millions of dollars to Hizballah, stands charged with engineering millions of dollars of transactions with unwitting U.S. companies, in violation of those laws.

Further, the charges expose the defendant to significant jail time. The charges against the defendant carry a maximum penalty of 20 years of incarceration. A preliminary analysis of the Sentencing Guidelines likely applicable if the defendant is convicted at trial yields an estimated sentencing guidelines range of 151-188 months of incarceration.

### II. THE WEIGHT OF THE EVIDENCE AGAINST THE DEFENDANT

The Government's evidence against the defendant is very strong. To prevail at a trial in this matter, the government must, in essence, prove that the defendant caused and carried out

transactions with U.S. persons or entities in knowing violation of the IEEPA statutes. Here, the defendant's own statements, made to OFAC both in his own hand and in letters from his attorneys, acknowledge his designation by OFAC and his understanding that, in order to legally do business with U.S. entities, he must have the OFAC designation lifted. Emails to and from the defendant, recorded phone calls between the defendant and a customer, and other evidence leave no doubt of the defendant's ownership and direction of the companies involved in the transactions. The transactions themselves are fully documented through bank records, other payment records, shipping records, emails or other business records. Finally, the defendant's intent to circumvent the OFAC restrictions is fully revealed by the defendant's own statements in recordings and emails as well as other evidence.

Count One of the indictment in this case sets forth a number of overt acts performed by the defendant in furtherance of the conspiracy to violate the IEEPA sanctions and to defraud the United States government. The government hereby incorporates those overt acts into this response.

## III. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The defendant is an extremely wealthy businessman with a foreign criminal record, foreign citizenship, no ties to the community or to the United States (aside from his illegal business dealings) and a history of using fake documents. These factors reveal the defendant to be untrustworthy and an extreme risk of flight. While the defendant mocks as "fanciful" the government's proposition that a man of Mr. Tajideen's means could buy his way out of the United States if the Court were to release him, (see Def's Mtn for Pretrial Release at p.13[1]) the defendant's background suggests such an achievement would be well within the defendant's reach.

[1] "The notion that Mr. Tajideen, a 62-year-old businessman in a foreign land, could escape from home detention, somehow get access to cash, hire someone to create a fake passport, and then secure transportation to a border or an airport without detection (where he would also need to buy a plane ticket) is fanciful."

The defendant has no ties to the community or even to the United States aside from his illegal business dealings, and has significant ties abroad that provide motivation and opportunities for him to flee. He is not a U.S. citizen and has no family in the United States of which the government is aware. After his designation by OFAC in May 2009 as a Specially Designated Global Terrorist, the defendant was prohibited from traveling to the United States, and presumably he has not done so since prior to that time. Currently, he has no legal immigration status and is present in the country because the Department of Homeland Security allowed that he enter for purposes of his prosecution. Currently, the defendant's only ties are through civil and criminal proceedings.

Meanwhile, the defendant's foreign ties and resources are immense. The defendant lives in Lebanon. He holds citizenship in at least three different countries: Belgium, Sierra Leone, and Lebanon. He owns or directs businesses operating in several other countries. Despite defendant's representation that "the government has already seized his passport," (Def's Mtn for Pretrial Release at p.2; see also 12-13) the defendant's Lebanese passport is not in the government's possession.[2] The defendant's home country of Lebanon does not have an extradition treaty with the United States, making an escape by the defendant back to that home particularly appealing. Indeed, he defendant need not even leave Washington, D.C. to effectively escape prosecution by seeking refuge in the sovereign territory of any of these countries, as each maintains an Embassy in the District. There, he could either remain sequestered or have new passports issued.

Moreover the defendant's prior criminal conviction shows that he is perfectly comfortable dealing with fake documents. In 2002, the Belgian State Security Service recommended to the Public Prosecutor of Antwerp that Kassim Tajideen be prosecuted for financing terrorism, blood

[2] The Government does have possession of the defendant's passports from Belgium and Sierra Leone.

diamond smuggling, and money laundering. The Public Prosecutor chose to charge Tajideen with leadership in a criminal organization and money laundering, related to a scheme wherein the defendant used forged documents to avoid tariffs on exported goods. He was convicted on both charges, sentenced to approximately 2 years of confinement, ordered to forfeit approximately $10 million, and banned for leading a corporation there for 10 years. In addition, the conflicting accounts of the defendant's place of birth amongst his three passports - two indicate his birth in Freetown, Sierra Leone, while the third indicates his birth in Lebanon[3] - raise questions as to what information the defendant provided to various governments when he obtained these passports.

The defendant's extreme wealth affords him opportunities and influence which make any pretrial release as proposed by the defendant problematic. The full extent of the defendant's wealth is unknown to the government. As set forth above, the investigation has revealed that companies linked to Tajideen conducted transactions estimated to be over half a billion U.S. dollars since his designation, and these transactions are only a percentage of the transactions conducted by Tajideen-related businesses. The order of the Belgian Court that he forfeit approximately $10 million dollars, and his offer to post a $2 million dollar cash bond also speak to his significant wealth.

## IV. THE DEFENDANT'S PROPOSAL TO CREATE HIS OWN "HOUSE ARREST" WILL NOT REASONABLY ASSURE HIS APPEARANCE.

In his Motion for Pretrial Release, the defendant proposes that the Court release him to an as-yet-undetermined location to be overseen by "two or more" armed guards in Mr. Tajideen's employ who would restrict access to the phone and to visitors, as well as other conditions. This proposal does little to reasonably assure his appearance.

[3] As indicated above, the government does not have possession of the defendant Lebanese passport. This description originates from a letter to OFAC officials from WilmerHale attorneys on behalf of the defendant.

While the defendant represents that he currently "has no access to his financial resources" (Def.'s Mtn for Pretrial Release at p.1-2) this statement is either untrue or irrelevant. As part of his motion for pretrial release, the defendant proposes to pay a $2 million dollar cash bond, as well as to rent a facility where he would be housed and hire an entire cadre of former law enforcement to oversee his release. One thing is certain: someone - be it the defendant or someone else- has access to financial resources that can be used to assist the defendant.

The influence of such wealth cannot be overstated. After the defendant's arrest overseas, during his detention pending extradition or expulsion, DEA received reports from a reliable source indicating that a group of Shia sheiks in a third country was offering a $20 million dollar reward for anyone who could get the defendant out of jail, and that persons from two other countries weighed in on the defendant's situation with the government of the country holding the defendant.

In the face of such wealth and influence, the defendant's offer to, in essence, create his own jail by renting a facility and staffing it with "two or more" armed guards at all times falls short. In reality, only a legitimate holding facility, administered by unbiased and otherwise accountable officials, with multiple locked doors, numerous rotating staff, video surveillance and restricted access to the facility can effectively detain – and assure the appearance of - a man of the defendant's wealth and influence.

The defense misses the mark when they describe the government's feared scenario as one involving a solitary older man wandering in a strange land, with no help or resources who is "somehow able to get access to cash, hire someone to create a fake passport and then secure transportation to a border or an airport without detection." Id at p. 13. Rather, the scenario is one involving a saavy international businessman who speaks English and has at his disposal his own

vast wealth and that of his wealthy friends in order to make arrangements for travel, documents, payoffs, private transportation, or other avenues necessary for his escape.

The defendant and persons with whom he has communicated have experience and familiarity with using fake documentation. The government's investigation has uncovered three emails sent to the defendant's nephew, Ahmad Tajideen, which casually reference the use of fake visas by 23 of the nephew's employees. As described above, the defendant's Belgian convictions for leadership in a criminal organization and money laundering related to a scheme wherein the defendant used forged documents to avoid tariffs on exported goods. And the defendant's own passports contain irregularities which call into question the methods or information used to obtain them.

## V. THE DEFENDANT'S CONDITIONS OF CONFINEMENT

In his motion, the defendant claims that he is being denied adequate food, medical care and religious accommodation in his current placement at the Rappahannock Regional Jail ("the facility" or "the jail"). Based on the government's communications with jail personnel, these claims are baseless. While the conditions of the defendant's confinement may not be to his liking, they are fully appropriate, take into account his medical and religious needs, and are not punitive.

The defendant claims that "he has requested simple foods such as rice, eggs, and fish, but the jail continues to serve him beans and meat he cannot eat." Def's Mtn for Pretrial Release at p.11. However, jail personnel indicate that the defendant was started on a vegetarian diet on March 25 – the day he arrived at the facility. At his request, on April 6 he began receiving a lacto-vegetarian diet.[4] Neither diet includes meat of any kind, and the entire jail facility is free of pork, which is the only type of meat prohibited in the Muslim faith. In response to the government's

[4] The government informed defense counsel of these accommodations during a phone call on April 24.

inquiry regarding the defendant's request for rice, eggs and fish, the jail indicates that, apart from the several available diets (such as the ones the defendant has been provided), the facility prepares special meals only when they are deemed medically necessary.

The defendant further claims that he has been "deprived of adequate medical care," indicating that he has not been examined, and that he suffers from "symptoms of depression . . . tightness in his chest, shortness of breath, and other health issues." Def's Mtn for Pretrial Release at p. 11. The defendant further claims that, "[a]lthough this Court ordered the jail to examine [the defendant] and provide him with adequate medical care the jail failed to comply with that order for nearly a month." Id. In fact, the defendant was never denied care for the conditions he lists above, since he never requested it, and he was seen and treated for medical issues at least three times in the first 22 days after the Court's order regarding medical treatment.

Defense counsel filed a one-page motion with the Court requesting that the facility provide the defendant with medical care on Friday, March 31. The Court issued a minute order the following Monday ordering that the facility "shall conduct a physical examination of the defendant or shall permit a medical doctor to visit the defendant and assess the defendant's current medical condition and provide treatment as necessary." The facility indicates that, from the date of his arrival at the facility until April 6, the defendant's blood pressure was monitored on multiple occasions and was found not to be problematic. The defendant then saw a physician's assistant on April 7 – four days after the Court's Order - and began receiving blood pressure medication on that date. He complained of gas pains on April 15, and was seen regarding that complaint on April 19 – sixteen days after the Court's order - and treated at that time.[5] A doctor examined the defendant on April 25, twenty-two days after the Court's order. After the defendant mentioned

[5] The government informed defense counsel of these visits and treatments during a phone call on April 24.

potential problems with cholesterol, medical personnel drew blood and had lab work performed. Significantly, while the defendant did complain of gas pains and cholesterol concerns to jail personnel (and thereby received treatment to address these concerns), the facility has no records of complaints by the defendant regarding the issues he now raises with the Court: weight loss, depression, tightness in his chest, and shortness of breath. Having not requested treatment regarding these maladies, he cannot reasonably complain that did not receive it.

In addition, defense counsel claims that their client has "lost at least 20 pounds" since his incarceration. As indicated above, the facility has no records of complaints by the defendant regarding weight loss. Due to accuracy issues with the scale used to weigh the defendant at intake, it is not possible to know exactly how much the defendant weighed when he entered the facility. However, facility personnel indicate that on April 24, May 1, May 8, and May 15 the defendant was found to weigh either 147 or 148 pounds. As such, the defendant's weight has been stable for the past month.

Finally, the defendant claims the facility has "deprived [him] of his right to reasonable religious accommodation." A review of the circumstances in place show that, far from denying the defendant religious accommodations, the facility has provided the defendant with all necessary accommodations.

Defendant claims he has "been denied access to a room with windows or to a compass that would allow Mr. Tajideen to determine the direction of Mecca, inhibiting his ability to pray in the proper direction and comply with the tenets of his Muslim faith." Def's Mtn for Pretrial Release at p. 11. Further, the defendant's motion again indicates that "the jail has refused to provide even simple food – such as fish, eggs, or halal meat – that would meet the requirements of Islam." Id. Here again, these claims are either inaccurate or are unsupported.

The facility houses other members of the Muslim faith and is familiar with their needs. The defendant was provided with a copy of the Koran at his arrival. He ordered and received a prayer rug in March, days after his arrival. Despite defense counsel's predictions of disaster during Ramadan, the facility is prepared to serve the morning meal before sunrise and double portions of the evening meal after sunset for the duration of that holy month.

Despite the defendant's assertion that the jail has "refused to provide" food that meets the requirement of his religion, the defendant's diet is appropriate for consumption by persons of the Muslim faith. Open sources indicate that pork is the only meat forbidden by the Muslim faith, and undersigned counsel sees no indications that beans, in any form, are forbidden, or that food such as fish, eggs or rice are required. Except perhaps by occasional mistake, the defendant receives no meat; at no time has he been provided with pork, since none is used in the facility, and, when requested, he has been placed on a vegetarian diet and then on a lacto-vegetarian diet. While the defendant may not be receiving all the foods he has requested, he does receive food which allows him to eat without compromising his religious beliefs. This fact is borne out by the records of the defendant's weight, which has not changed appreciably in the last month.

Finally, the defendant complains that the facility is unwilling to assist him in determining the direction of Mecca, to allow him to pray in that direction in accordance with Muslim custom. Conversations with facility personnel reveal that, in response to his earlier requests for assistance with this issue, jail personnel indicated the direction of north to Mr. Tajideen on two or three occasions, that on another occasion a cell phone was brought to his cell in order to show him the directionality indicated on the compass function it contained, and that a map of the facility was provided to the defendant which indicates compass directions thereon. All of these

accommodations were provided on various dates prior to April 20.[6] After the defendant was moved to a different cellblock, so as to be in general population, a cell phone was again brought to Mr. Tajideen and used to allow him to orient himself for purposes of prayer.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the United States respectfully requests that the Court deny the Defendant's Motion for Pretrial Release.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

By: ____/S/______________________________

Deborah Curtis, CA Bar #172208
Thomas A. Gillice, DC Bar # 452336
Assistant United States Attorneys
Jacqueline L. Barkett, NY Bar #5424916
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
deborah.curtis@usdoj.gov
thomas.gillice@usdoj.gov
jacqueline.l.barkett@usdoj.gov

And

DEBORAH CONNOR
ACTING CHIEF

By: ____/S/______________________________

Joseph Palazzo, MA Bar #669666
Trial Attorney
Money Laundering and Asset Recovery
Section, Criminal Division

[6] The government informed defense counsel of these accommodations during a phone call on April 24.

United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20005
(202) 514-1263
joseph.palazzo@usdoj.gov

Dated: May 15, 2017